## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF KENTUCKY (at London)

| | | |
|---|---|---|
| **JOSEPH BINGHAM** | : | Case No.: |
| c/o Christopher Wiest, Esq. | | |
| 25 Town Center Blvd., Ste. 104 | : | |
| Crestview Hills, KY 41017 | | |
| | : | |
|      Plaintiff | | |
| | : | |
| v. | : | |
| | : | |
| **JOHN ROOT** | | |
| *In his official and individual capacities* | : | |
| 203 S. Broad Street | | |
| London, KY, 40741 | : | |
| | | |
| and | : | |
| | | |
| **JOHN DOE DEPUTIES 1-10** | : | |
| *In their individual capacities only* | | |

### PLAINTIFF'S VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES, WITH JURY DEMAND ENDORSED HEREON

### Introduction

1. This lawsuit stems from an unlawful warrantless search and seizure of products being marketed or sold by the Plaintiff and his business by the Defendants on or about February 25, 2022, known as delta-8 tetrahydrocannabinol, which are derivatives of hemp, and the continued illegal detention of those products to the present.

### Parties

1. Plaintiff, Joseph Bingham is, and at all times relevant hereto has been a resident of Kentucky and this District and division.  He is, and has been at all times relevant hereto, the owner and operator of two CBD/hemp businesses located in Laurel County,

1

Kentucky, one at 909 S. Laurel Road, Suite 1 and 2, London, KY 40744 ("909 location") and the second at 107 CVB Drive, Suite 3, London, Ky 40741 ("107 location").

2. Defendant, John Root, is the duly elected and installed Sheriff of Laurel County, Kentucky and has held that office at all times relevant hereto.  He is sued in his personal capacity for money damages, and in his official capacity for declaratory and injunctive relief.

3. Defendants John Doe Deputies 1-10, are duly appointed deputy Sheriffs with the Laurel County, Kentucky Sheriff's office.  They are sued in their personal capacities for money damages.

## Jurisdiction and Venue

4. Subject matter jurisdiction over the federal claims and causes of action asserted by the Plaintiff in this action is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

5. This Court has personal jurisdiction over Defendants because they are citizens of and reside in Kentucky and this judicial district.

6. Venue is proper in this District and Division under 28 U.S.C. 1391(b)(1) and (2) in that the Defendants reside in, and the facts giving rise to this matter arose in, the Eastern District of Kentucky and the London Division.

## Facts

### Background on Hemp regulation in the Commonwealth of Kentucky

7. From the founding of the United States, until 1937, the growth of hemp in the United States was a staple and important industry in this country.[1] George Washington himself was known to extol the virtues of hemp, and grew hemp at Mount Vernon.[2]

8. In 1937, Congress passed the Marihuana Tax Act, in no small part because of the fearmongering of Harry Anslinger, who took the scientifically unsupported idea of marijuana as a violence-inducing drug, connected it to black and Hispanic people, and created a perfect package of terror – fueled on racism -- to sell to the American media and public.[3]

9. Starting in 2014, however, with the 2014 Farm Bill, federal policy began to distinguish between hemp and industrial hemp, and its cousin, marijuana.

10. In 2018, Congress again, in the 2018 Farm Bill, passed measures intending to legalize the former, while continuing to criminalize the later, creating a definition for hemp:

(1) Hemp. The term "hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.

7 U.S.C. 1639o

11. Congress also amended the Controlled Substances Act, to account for this definition, and clear legalization, of industrial hemp. Controlled Substances Act. 21 USCS § 802(16)(B). That provision states:

"(B) The term 'marihuana' does not include—

---

[1] https://www.pbs.org/newshour/nation/8-things-didnt-know-hemp (last visited 7/10/2021).
[2] https://www.mountvernon.org/george-washington/farming/washingtons-crops/george-washington-grew-hemp/ (last visited 7/10/2021).
[3] https://www.businessinsider.com/racist-origins-marijuana-prohibition-legalization-2018-2 (last visited 7/10/2021).

(i) hemp, as defined in section 297A of the Agricultural Marketing Act of 1946 [7 USCS § 1639o]; or

(ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination."

12. In turn, the Drug Enforcement Agency amended Schedule I to accommodate this definition, which now states:

Tetrahydrocannabinols, DEA reference 7370, Schedule I provides at 21 CFR 1308.11(31)(ii) that: "(ii) Tetrahydrocannabinols does not include any material, compound, mixture, or preparation that falls within the definition of hemp set forth in 7 U.S.C. 1639o."

13. The Kentucky General Assembly has also undertaken significant revisions to Kentucky law to accommodate industrial hemp and products derived from it.

14. First, Kentucky's General Assembly enacted its policy concerning hemp in KRS 260.852:

It is the declared policy of the Commonwealth that hemp is a viable agricultural crop in the Commonwealth. The purposes of KRS 260.850 to 260.869 are to:

(1) Promote the research and study methods of cultivating, processing, and marketing hemp;

(2) **Promote the expansion of the Commonwealth's hemp industry to the maximum extent permitted by federal law** by allowing citizens of the Commonwealth to cultivate, handle, or process hemp and hemp products for commercial purposes; and

(3) Move the Commonwealth and its citizens to the forefront of the hemp industry. (emphasis added).

15. Further, the General Assembly enacted KRS 260.850, which contains the following definitions:[4]

---

[4] This section also defines "Commissioner" to be the Commissioner of the Kentucky Department of Agriculture, and "Processing" as converting an agricultural commodity into a marketable form.

(5) "Hemp" or "industrial hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis;

(6) "Hemp products" or "industrial hemp products" means products derived from, or made by, processing hemp plants or plant parts;

16. Further, KRS 260.858 provides the statutory scheme for products made from industrial hemp in the Commonwealth.  It provides:

(1) Notwithstanding any other provision of law to the contrary, it is lawful for a licensee, or his or her agent, to cultivate, handle, or process hemp or hemp products in the Commonwealth.

(2) It is unlawful for a person who does not hold a license issued by the department, or who is not an agent of a licensee, to cultivate, handle, process, or market living hemp plants or viable seeds, leaf materials, or floral materials derived from hemp. Penalties for persons who cultivate, handle, process, or market living hemp plants or viable seeds, leaf materials, or floral materials derived from hemp without a license are the same as those penalties that are applicable to persons who violate KRS Chapter 218A, relating to marijuana.

(3) It is unlawful for a person who does not hold a license issued by the department, or who is not an agent of a licensee, to possess hemp extract material having a delta-9 tetrahydrocannabinol concentration in excess of three-tenths of one percent (0.3%). Penalties for persons who possess such hemp extract materials without a license are the same as those penalties that are applicable to persons who violate KRS Chapter 218A, relating to marijuana.

17. Applying the plain meaning of this provision KRS 260.858, (a) licensees may cultivate and process hemp and hemp products in the Commonwealth; (b) non-licensees may possess hemp extract material having a delta-9 tetrahydrocannabinol concentration at or below three-tenths of one percent (0.3%).[5]

---

[5] This, in part, is because and through the application of the interpretive doctrine "*expressio unius est exclusio alterius*," which means that the mention of one thing implies the exclusion of another. *Fox v. Grayson*, 317 S.W.3d 1, 8-9 (Ky. 2010).  The express prohibition on non-licensees having hemp extract material products that contain greater than three-tenths of one percent (0.3%), implies that any products having less than this concentration are legal.

18. KRS 260.8635 further contains a prohibition (with an exception) on moving or transporting "any hemp extract material having a delta-9 tetrahydrocannabinol concentration in excess of three-tenths of one percent (0.3%)."

19. Pursuant to KRS 260.862, the Department of Agriculture "shall have the authority and power to **promulgate administrative regulations** to: … (c) Prescribe sampling and testing procedures to ensure that hemp and hemp products cultivated, handled, processed, or marketed under the authority of this section do not exceed the concentration levels defined in federal law as it currently exists or as it may be subsequently amended; (d) Define classes or categories of hemp products that are eligible for sale, transfer, or distribution to members of the public; …" (emphasis added).

20. Pursuant to KRS 250.355:

(1) The director,[6] or the director's designee, shall receive samples and test hemp plants, plant parts, and materials grown or located within the Commonwealth in order to determine whether the hemp plants, plant parts, and materials are in compliance with the provisions of KRS 260.850 to 260.869 and the administrative regulations promulgated thereunder.

(2) The director, or the director's designee, shall perform testing services as the primary laboratory for delta-9 tetrahydrocannabinol as required by the department. The department may contract with other qualified laboratories to perform delta-9 tetrahydrocannabinol testing services when required.

21. Kentucky's Controlled Substances Act also contains definitions that are relevant. Specifically, the Act defines "Marijuana" as "all parts of the plant Cannabis sp., whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin or any compound, mixture, or preparation which contains any quantity of these

---

[6] Pursuant to KRS 250.010, "(4) "Director" means the director of the Agricultural Experiment Station or his designee."

substances. The term 'marijuana' does not include: (a) Industrial hemp that is in the possession, custody, or control of a person who holds a license issued by the Department of Agriculture permitting that person to cultivate, handle, or process industrial hemp; (b) Industrial hemp products that do not include any living plants, viable seeds, leaf materials, or floral materials; … (e) A cannabidiol product derived from industrial hemp, as defined in KRS 260.850." KRS 218A.010(28).

22. Finally, Kentucky has legalized cannabidiols as a substance for human consumption, which requires certain testing based on the "amount of delta-9 tetrahydrocannabinol." KRS 217.039.

### Production of Delta-8 Tetrahydrocannabinol Products

23. The production of Delta 8 products begins with the growing of industrial hemp, which is itself compliant – that is to say that the hemp plant itself has "a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis."

24. For growers, this means starting with the Cannabis sativa L. plant, and, based on Kentucky Department of Agriculture regulations, ensuring that the plant is harvested at a time when its concentration of delta-9 tetrahydrocannabinol concentration is not more than three-tenths of one percent (0.3%) on a dry weight basis.  For purposes of this Complaint, we have denoted "Compliant Hemp" as the Cannabis sativa L. plant, which have a delta-9 tetrahydrocannabinol concentration is not more than three-tenths of one percent (0.3%) on a dry weight basis.  As an aside, delta-8 tetrahydrocannabinol is found naturally in the Cannabis sativa L. plant.

25. The Complaint Hemp plants are usually harvested around October. Before they can officially harvest, a sample of each crop is tested and cleared by the Kentucky Department of Agriculture. This is to assure that the farm is following federal regulations, keeping their hemp at not more than three-tenths of one percent (0.3%) on a dry weight basis.

26. If the plant exceeds these delta-9 concentration limits, it is permitted to be retested, but, if it is still not in compliant with the delta-9 concentration limit, it is destroyed.

27. Once harvested, the Complaint Hemp plants are put up to be cured, or air dry in a well-ventilated area. This curing process takes 3-4 weeks. Once dried, the flowers, which contain the strongest concentration of cannabinoids, are stripped from the plants and then shipped to manufacturers that then extract the cannabinoids.

28. Extraction is the process of removing the CBD extract from the Complaint Hemp plant to turn it into a usable form. Each extraction method results in a slightly different end result, but depending on how it's extracted, the raw extract will have a thick oily texture with a very dark, almost black, hue.

29. There are different extraction methods and each, from the producers' point of view, has its own pros and cons. Most common extraction methods include:

   a. Ethanol Extraction:  This method involves soaking the plant in high-grain alcohol in order to extract the cannabinoids.  Ethanol extraction is now one of the most common methods of today's high-quality natural extractions and is gaining traction as one of the most effective on the market.  Sometimes this ethanol extraction will be followed up by fractionalized distillation.

b.    CO2 Extraction: CO2 extraction uses carbon dioxide to isolate cannabinoids under extremely low temperatures. Super-cooled and condensed carbon dioxide cools and then extracts CBD oil without leaving any chemicals or residue behind. This process requires robust equipment, but yields a safe end product.

c.    Oil Extraction:  Another method is the oil method, which is popular with at home or on farm producers. In this method, the hemp plant is heated and cooked in a carrier oil such as olive oil which extracts the desired cannabinoids.

30. CBD products are tested for compliance, and producers test the products to ensure they have a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis.

31. There is no dispute that CBD products are legal.

32. CBD products are then converted through isomerization to Delta-8 products.

33. This is accomplished through the application of a non-polar organic solvent. Common solvents include alkanes like heptane.

34. Acids are then added into the solvent solution, and the mixture is maintained at a temperature of 100 degrees Celsius while continually stirring for upwards of 18 hours. Popular solvents for that process include alumina acid-washed, p-toluenesulfonic acid, and hydrochloric acid (all known as Lewis acids).

35. Once the chemical reaction is complete, and the upper phase is separated, and the solution is then washed and neutralized.  This is accomplished by adding a base solution (e.g. an aqueous 5% $NaHCO_3$ (sodium bicarbonate)).

36. At that point, a Delta-8 extract is present; for purposes of this Complaint and lawsuit, that extract, and the products derived from it, all have a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis.

37. From the Delta-8 extract, various Delta-8 Products are derived or manufactured, all with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis.

38. To be clear, these Delta-8 Products are "derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers" from "the plant Cannabis sativa L. and any part of that plant," and have "a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis."  7 U.S.C. 1639o; KRS 260.850.

39. Delta-8 Products are contained in topical applications, including oils, and other applications.

<u>The Boone Circuit Court lawsuit</u>

40. In July, 2021, following certain raids by the Kentucky State Police, and guidance issued by the Kentucky Department of Agriculture, regarding Delta-8 Products, a lawsuit was brought against Kentucky Agriculture Commissioner Ryan Quarles and Kentucky State Police Commissioner Philip Burnett, in the Boone Circuit Court styled *Kentucky Hemp Assocation, et. al. v. Quarles, et. al.*, Case No. 21-CI-000836.

41. On February 28, 2022, the Boone Circuit Court issued a injunction against any enforcement of Delta-8 Products, finding such products, provided they are derived from Complaint Hemp, legal ("Boone Circuit Court Order").  A true and accurate copy of that order is attached as Exhibit 1 hereto.

42. Delta-8 Products are legal, and are not contraband, and, at all times relevant hereto (2021 to the present) have been legal and not contraband.

<u>Defendants' Activities that give rise to this suit</u>

43. On February 25, 2022, Defendants each, personally, conducted warrantless raids and product seizures of Delta-8 Products being sold and held as inventory by the Plaintiff at both of business locations in Laurel County, Kentucky, at 909 S. Laurel Road, London, KY 40701 and 107 CVB Drive, Suite 3, London, Ky 40744 (the "Seized Products").  The Seized Products have a value of more than $50,000.

44. Further, while certain of the Seized Products were kept out front for sale to the public, a substantial portion of the Seized Products were kept in the back, in containers, that the public did not have access to and were not in plain view, but Defendants nevertheless accessed and searched without a warrant (and then seized).

45. Defendants each, personally, had no probable cause to believe that any of the Seized Products were illegal.

46. Plaintiff did not consent to any of the seizures or searches regarding the Seized Products.

47. Plaintiff has maintained product origination certificates regarding the products that demonstrate that the products seized are Delta-8 Products that were derived from Complaint Hemp.

48. On or about March 4, 2022, Plaintiff provided a copy of the Boone Circuit Court Order to Defendant Root, and demanded the return of the Seized Products.  Root refused to return same.

49. In the same vein, Plaintiff has not faced any criminal charges, and no judge has, to date, signed off on the illegal seizures by Root or his deputies.

50. Defendants have neither returned the Seized Products, nor afforded Plaintiff any means or process or hearing to obtain or have the opportunity to obtain the return of the Seized Products.

### COUNT I – 42 USC § 1983 – Fourth Amendment Violation

51. Plaintiff reincorporates the preceding paragraphs as if fully written herein.

52. The warrantless seizure of the Seized Products by Root and John Doe Deputies 1-10 on February 25, 2022 violated the Fourth Amendment of the United States, which states, in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

53. The Fourth Amendment has been incorporated against the states and their agents, to include Sheriffs and their Deputies, in *Mapp v. Ohio*, 367 U.S. 643 (1961).

54. Clearly established case law provides that a seizure of personal property is "per se unreasonable . . . unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). If law enforcement authorities have probable cause to believe a container holds evidence of a crime and the "exigencies of the circumstances demand it," seizure of the container pending issuance of a warrant to examine the contents is permitted. *Id.*

55. The Fourth Amendment applies to businesses, as well as individuals. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) ("[I]t is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence.").[7]

56. "The right to be free from unreasonable searches and seizures is clearly established." *Greer v. City of Highland Park, Michigan*, 884 F.3d 310, 316 (6th Cir. 2018).  And it does not depend on what local officials think may be lawful or unlawful in terms of a product.  *Virginia v. Moore*, 553 U.S. 164, 172, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008).

57. Because all of the foregoing cases were decided prior to the February, 2022 warrantless illegal seizures by Defendants, Defendants' illegal seizure and detention of the Seized Products violates the clearly established rights of the Plaintiff.

58. Defendants, under color of any statute, ordinance, regulation, custom, or usage, and exercising and abusing powers granted to them from the Commonwealth of Kentucky and Laurel County, subjected, or caused to be subjected, the Plaintiff, who is a person within the jurisdiction of the United States, to be deprived of his rights, privileges, or immunities secured by the Constitution and United States laws.  They are therefore liable to him pursuant to 42 U.S.C. 1983 under an action at law, suit in equity, or other proper proceeding for redress.  They are further liable to the Plaintiff for his reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

59. Plaintiff has suffered damages as a result of the foregoing, and continues to be damaged by operation of the foregoing.  Further, Plaintiff continues to suffer irreparable harm from

---

[7] That distinction may not matter here, as the store locations in question are owned by the Plaintiff, and merely do business as a trade name, and have no separate corporate form from the Plaintiff himself.

the actions of the Defendants, and the court should award declaratory and/or injunctive relief.

60. Plaintiff further seeks punitive damages against Defendants, in their individual capacities, since the actions complained of were motivated by evil motive or intent, and/or when it involves reckless or callous indifference to the federally protected rights of Plaintiff. Plaintiff demands judgment on these punitive damages against Defendants, in their individual capacities, in an amount to be determined at trial.

## <u>COUNT II – 42 USC § 1983 – Procedural Due Process</u>

61. Plaintiff reincorporates the preceding paragraphs as if fully written herein.

62. The Fourteenth Amendment to the United States Constitution states, in relevant part, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law"

63. Plaintiff had a protected property interest at issue in the Seized Products. Defendants each, individually, personally participated in depriving Plaintiff of those protected property interests. And Defendants have not afforded Plaintiff any means or mechanism to obtain the return of the Seized Products.

64. Defendants have thus violated the clearly established procedural due process rights under the Fourteenth Amendment, as set forth *Paterek v. Vill. of Armada*, 801 F.3d 630 (6th Cir. 2015) and other cases.

65. Defendants, under color of any statute, ordinance, regulation, custom, or usage, and exercising and abusing powers granted to them from the Commonwealth of Kentucky and Laurel County, subjected, or caused to be subjected, the Plaintiff, who is a person

within the jurisdiction of the United States, to be deprived of his rights, privileges, or immunities secured by the Constitution and United States laws.  They are therefore liable to him pursuant to 42 U.S.C. 1983 under an action at law, suit in equity, or other proper proceeding for redress.  They are further liable to the Plaintiff for his reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

66. Plaintiff has suffered damages as a result of the foregoing, and continues to be damaged by operation of the foregoing.  Further, Plaintiff continues to suffer irreparable harm from the actions of the Defendants, and the court should award declaratory and/or injunctive relief.

67. Plaintiff further seeks punitive damages against Defendants, in their individual capacities, since the actions complained of were motivated by evil motive or intent, and/or when it involves reckless or callous indifference to the federally protected rights of Plaintiff. Plaintiff demands judgment on these punitive damages against Defendants, in their individual capacities, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendants as prayed for, including:

A. That this Court issue a declaration that the practices complained of herein, by Defendants were and are unconstitutional;

B. That this Court issue an injunction enjoining further unconstitutional actions by Defendants and directing the return of the Seized Products;

C. That Plaintiffs be awarded money damages, including both compensatory and punitive damages against the individual capacity Defendants, in an amount to be proven at trial, and exceeding $10,000.00, exclusive of interest and costs;

D.  That trial by jury be had on all issues so triable;

E.  That Plaintiffs be awarded their costs in this action, including reasonable attorney fees

    under 42 U.S.C. § 1988; and

F.  Such other relief as this Court shall deem just and proper.

Respectfully submitted,

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Jason Nemes
Jason Nemes
Commonwealth Counsel Group
10343 Linn Station Rd Ste 100
Louisville, KY 40223
*Attorneys for Plaintiff*

## JURY DEMAND

Pursuant to FRCP 38 and other applicable law, Plaintiffs demand trial by jury on all causes so triable.

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. 1746, I, Joseph Bingham, declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate and the documents attached are true and accurate copies of what they purport to be.

Executed on _____4-27-2022_____

Joseph Bingham